Frances Ambuhl v. Commissioner.
Ambuhl v. Comm'r
Docket No. 33032.
United States Tax Court
1953 Tax Ct. Memo LEXIS 333; 12 T.C.M. (CCH) 284; T.C.M. (RIA) 53083; March 17, 1953
*333 1. Part of the deficiency in petitioner's income tax for each year 1942 through 1945, respectively, found to be due to fraud with intent to evade tax. 2. Petitioner held liable for additions to tax for the years 1944 and 1945, respectively, because of the substantial underestimation of her estimated tax in those years. Ben C. Green, Esq., 705 N.B.C. Building, Cleveland, Ohio, for the petitioner. James F. Kennedy, Jr., Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes and additions thereto against petitioner, as follows: Addition to Tax
Addition to Tax
Year
Deficiency
Under Sec. 293(b)
Under Sec. 294(d)(2)
1942
$1,078.07
$ 539.04
1943
8,161.02 (includes
3,991.34
victory tax)
1944
9,508.60
4,754.30
$552.98
1945
4,889.74
2,444.87
273.13
*334 The foregoing deficiencies in income tax in the aggregate amount of $23,637.43 were paid by petitioner to the collector of internal revenue at Cleveland, Ohio, on December 10, 1948, which amount is now held by him in a suspense account. At the hearing, petitioner conceded the correctness of respondent's determinations of deficiencies in income taxes. Thus, the only questions remaining for our consideration are respondent's determination of additions to tax for fraud and the substantial underestimation of estimated tax, as set out above. Findings of Fact The partial stipulation of facts filed by the parties is so adopted and made a part hereof. Petitioner is Frances Ambuhl, an individual with her principal residence in East Cleveland, Ohio. The years here involved, for which respondent determined deficiencies and additions to taxes as set forth in the notice of deficiency, are 1942, 1943, 1944 and 1945. The income tax returns for those years were filed with the collector of internal revenue at Cleveland, Ohio. Such returns indicate that the reported taxable net income was as follows: 1942
$1,808.76
1943
1,790.52
1944
2,514.10
1945
2,244.78 On the basis *335 of the foregoing returns, taxes were assessed and collected. Respondent determined that petitioner's net income in the same years was respectively as follows: 1942
$ 6,476.42
1943
21,113.46
1944
23,909.04
1945
15,615.50 Based upon the foregoing determination, respondent determined deficiencies in the above years totalling $23,637.43. Petitioner was born August 31, 1904, in Hastings, Pennsylvania. She was the daughter of a miner. She went to school in Antigo, Pennsylvania, and reached the fifth or sixth grade. Her mother then took her out of theretofore existing between her and Milton Ambuhl (hereinafter called Am 1923, when petitioner was approximately nineteen years of age, she came to Cleveland, Ohio, and lived with her brother. She obtained a job working in an ice cream parlor where she worked behind a soda fountain for seventeen years. In 1927, petitioner married Milton Ambuhl. She divorced him in 1931. She remarried him about a year later. On or about November 28, 1941, petitioner was again divorced absolutely from the bonds of matrimony theretofore existing between fbuhl). In these proceedings, petitioner pleaded inter alia that Ambuhl was about to *336 abscond with funds belonging to her, and prayed that he be enjoined from doing so. The decree subsequently entered provided for the creation of an equal partnership in the cafe theretofore and thereafter operated by them under the name of the Sixty-Niner's Cafe. After the divorce, petitioner and Ambuhl conducted the business together on the basis of such an equal partnership and during the years involved so continued their operation of the cafe. The partnership was one in which each partner contributed both capital and services to the business. Usually petitioner worked during the daytime at the partnership's cafe. While on duty, she tended bar and performed all other functions necessary in the operation of a bar. Her duties consisted of waiting on customers, cleaning, and the general work of a barmaid. In addition, she also paid bills presented to her by vendors of beer and miscellaneous small items. Her duties did not include the payment of bills for hard liquor. Prior to 1941, petitioner had never worked in a saloon. She had no training in the keeping of books and records. She sometimes deposited receipts in the bank. General management of the business, including the hiring *337 and firing of employees, the keeping of books and records, the paying of salaries to employees, the paying of rent and bills for larger items, including those for hard liquor, the determining of business policies and the preparing of tax return were all done by Ambuhl. Two bank accounts were maintained in the names of petitioner and Ambuhl bearing the additional designation of Sixty-Niner's Cafe. One was a commercial account at the Cleveland Trust Company which required both signatures for withdrawals. The other was savings account No. X9177 at the Equity Savings and Loan Association. The balance in this joint savings account increased by substantial amounts during 1942 and 1944. Petitioner maintained a separate savings account in her own name at the Cleveland Trust Company designated as account No. X5911. To this account, petitioner made sixteen deposits in 1942 totalling approximately $1,900 and no withdrawals. In 1943, she made thirteen deposits therein totalling approximately $2,600. On October 9, 1943, the petitioner withdrew $5,000 from this account. During the years involved, except for the year 1942, the partnership of Ambuhl and petitioner also operated an apartment building *338 which consisted of twenty-three apartments. This building was located at 1721-27 Chapman Avenue, East Cleveland, Ohio, and was purchased by petitioner and her partner, Ambuhl, in October 1943, at a cost of $66,250, of which $31,250 was paid down. At the time of the purchase, petitioner was aware of the price paid, and the above mentioned withdrawal of $5,000 by petitioner from her personal savings account was made for the purpose of making up part of the down payment. As was true of the income derived from the Sixty-Niner's Cafe, all earnings from this apartment venture belonged equally to each partner. Approximately one month after the purchase of the apartment building, account No. X0788 was opened at the Equity Savings and Loan Association. This account bore the home address of petitioner only. For withdrawals from this account, both petitioner's signature and that of her partner were required. There were generally one or two deposits made to this account each month. Such deposits for the most part averaged in aggregate from approximately $900 to $950 per month. The average monthly rent receipts from the apartment building operated by petitioner and Ambuhl totalled $950. Petitioner, *339 while aware of the approximate amount of such receipts and while she on occasions took them to the bank, never bothered to ascertain the exact amount thereof. All such matters were left to Ambuhl. During January 1945, petitioner purchased war bonds in the face amount of $5,900. Between January 1, 1942, and December 31, 1945, the joint net worth of petitioner and Ambuhl increased by approximately $120,000. On January 11, 1946, account No. X2607 was opened at the Equity Savings and Loan Association in the name of Clarence Renshaw, Milton Ambuhl and Frances Ambuhl, Trustees. This account required but one signature for withdrawal. One of the first deposits to this account was $13,241.51 being the proceeds of account No. X0788 which had been closed out on January 24, 1945. Within one and one-half months after its opening, account No. X2607 was closed and its proceeds deposited in account No. 42700 having a similar designation but requiring both signatures for withdrawals. During the period 1942 through 1945, the petitioner knew of her obligation to pay income taxes. At or about the time for filing of tax returns, petitioner had conversations relating thereto with Ambuhl. The tax returns *340 filed in the name of petitioner for the years involved were prepared and filed by Milton Ambuhl. The petitioner's return for 1944 was not signed and was filed in blank. All others have, on the signature line, what purports to be the signature of petitioner. The only return actually containing her signature is the one for 1945. Petitioner's name was signed to those for 1942 and 1943 by Ambuhl. In addition to the individual tax returns, those for the partnership were also entirely prepared and filed by Ambuhl. All returns so prepared and filed by Ambuhl were false and fraudulent and were signed with intent to evade tax. Petitioner was capable of reading the returns in question and, had she bothered to have done so, she possessed sufficient intelligence to understand such rudimentary facts as to how much income was being reported thereon. Ambuhl was convicted of tax evasion for 1942, 1943, 1944 and 1945 with respect to the income of his partnership with petitioner. While he served his term in the penitentiary in 1949, the partnership business was conducted by one Earl Thurn. Throughout the period involved, Milton Ambuhl had a general reputation for being dishonest. In addition, *341 we find as ultimate facts that: Part of the deficiency for each of the years 1942 through 1945, inclusive, is due to fraud with intent to evade tax. In each of the years 1944 and 1945, 80 per cent of the petitioner's tax exceeded the amount of petitioner's estimated tax; and petitioner is liable for additions to tax as provided in section 294 (d) (2), I.R.C. for those years because of substantial underestimation of her estimated tax. Opinion VAN FOSSAN, Judge: As set out above, petitioner at the hearing conceded the correctness of respondent's determinations of deficiencies in income taxes for all the years here involved. Whereupon, respondent moved for judgment in the aggregate amount of such deficiencies. This motion was taken under advisement. In view of petitioner's concession that respondent's determination of deficiencies in income taxes for the years 1942 through 1945, respectively, are correct, the determinations are sustained. The primary issue remaining in controversy is whether petitioner is liable for the 50 per cent addition to tax imposed by section 293 (b), Internal Revenue Code[1] in each of the years 1942 through *342 1945, as determined by respondent. The addition to tax in question is properly to be imposed only if, after considering all the facts, any part of the deficiency for that year is found to have been due to fraud with intent to evade tax. A so-called fraud penalty may not be sustained unless it be shown by clear and convincing proof that the taxpayer, against whom it is sought to be imposed, had in mind fraudulent evasion at the time the returns in question were filed. The burden of demonstrating the existence of such fraudulent intention is by statute placed upon the respondent. Whether a fraudulent intention is held by a taxpayer at a given time, is a fact to be gleaned, as any other fact, from the evidence of record and inferences properly to be drawn therefrom. Charles E. Mitchell, 32 B.T.A. 1093, *343 aff'd sub nom, Helvering v. Mitchell, 303 U.S. 391. As was said by this Court in Charles E. Mitchell, supra: "In this situation the trier of the facts is charged with the responsibility of passing on the credibility of the evidence. This duty involves the winnowing of the wheat of truth from the chaff of untruth - the sorting of the real from the seeming. This duty is not without its inherent difficulty. In cases such as this, almost without exception, the taxpayer testifies categorically to the purity of his motives and the absence of fraudulent intent. And if, on the whole record, he convinces those charged with decision of his forth-rightness of purpose, his innocence of improper motive, the impenetrable honesty of his position - if neither contradictory circumstance nor inherent lack of probability weakens his credibility, he must prevail. On the other hand, if, after listening to the taxpayer's protestations of innocence and hearing his explanations of his conduct, the trier of the facts is unable to give such protestations full weight and such explanations full credence, if on the whole record of fact, inference, and circumstance there abides in the *344 mind of the trier a conviction, based on clearing and convincing evidence, that fraud has been committed, then the decision must be against him. P. B. Fouke, 2 B.T.A. 219; L. Schepp Co., 25 B.T.A. 419." In the instant proceeding, the evidence shows petitioner to have possessed knowledge of her duty and responsibility toward the filing of accurate tax returns and the payment of the tax shown therein to be due. From these facts, we infer that the returns for each of the years involved filed in petitioner's name were intended by her to be accepted by the Government as a true and correct computation of the tax due from her. To conclude otherwise is to infer that petitioner, although aware of her duty to file returns and to pay income tax, willfully declined and omitted to do either. We have found as a fact, and petitioner readily admits, that all of the returns so filed in her name were false and fraudulent. But petitioner denies harboring a fraudulent intent. She attempts to excuse the falsity and fraudulence of such returns with the explanation that she was an ignorant and simpleminded person, who, although realizing her duty to pay income taxes, did not *345 comprehend nor understand the nature of the returns filed in her name. Petitioner's claim of ignorance and lack of astuteness is contradicted by evidence showing that she could read, and strongly indicating that had she but read the returns filed in her name, or inquired as to their contents, she possessed sufficient intelligence to understand such rudimentary facts as the amounts reported therein as income. It was her duty to know the truth and the accuracy of the returns made with her consent and in her name. If she abstained from acquainting herself with these facts when acquaintance therewith should have been made, she cannot be heard to rely upon her ignorance. Such willful ignorance, if it be a fact, is no defense. Petitioner protests that she had implicit faith in Ambuhl and fully trusted him to do the right thing in preparing and filing her returns; that she had no occasion to know or to suspect anything amiss; and that, therefore, she had no reason to make inquiry. Petitioner's claim of childlike faith and trust in Ambuhl following her second divorce from him is belied by facts strongly indicating that she was well aware of his general reputation for dishonesty; that she, *346 in fact, experienced the consequences thereof prior to the years here under review; and that she actually possessed no such feelings, at least to the degree that she would here have us believe. Under such circumstances, petitioner's utter and reckless disregard for the veracity and accuracy of the statements made in her name and upon which the Government was expected to rely and act leads but to the inference of fraud. White v. United States, 20 Fed. Supp. 623. The factual situation here is clearly distinguishable from that found in Dale R. Fulton, 14 T.C. 1453. In that case, the taxpayer involved had unwittingly employed an agent to prepare his tax returns, which agent when judged by appearances, was a reputable practitioner capable of giving proper tax advice to his clients. This agent was in fact an unscrupulous individual, the taxpayer being but one of his many innocent victims. The preparation and filing of false and fraudulent returns was found not to have been within the scope of his authority as the taxpayer's agent. Furthermore, the evidence there showed that the taxpayer was not forewarned of any fraud. Nor, having such knowledge, did he accept *347 the fruits thereof. However, such is not the case here. Ambuhl was a person generally known to be disreputable and the evidence plainly shows that petitioner was aware of his true character and reputation. Nevertheless, being so forewarned, she accepted and benefited from the ill-gotten fruits of his fraudulent conduct. Moreover, the preparation and filing of such false and fraudulent returns appear to have been well within the scope of Ambuhl's authority as agent for petitioner. Under our laws, every taxpayer has a duty to make and file with the Government a fair and accurate return of income. The responsibility for filing such returns is personal with each taxpayer and only "* * * in rare instances can the consequences incident thereto be delegated to another." Charles E. Mitchell, supra. Certainly, such obligation is not lightly to be satisfied by a transfer or delegation thereof to a person known to be of questionable integrity, thereupon washing one's hands of any responsibility therefor. Petitioner's participation in the fraud committed against the Government was more than mere passive acquiescence. Much of her testimony is so inherently improbable as to be unworthy *348 of belief. We are of the opinion that the respondent has proved by clear and convincing evidence that some part of the deficiency of the petitioner's income tax for each of the years was due to fraud with intent to evade tax, and we so hold. There remains the question involving the liability of petitioner for additions to tax for the years 1944 and 1945, respectively, because of the substantial underestimation of her estimated tax for both such years. The pertinent statutory provision is section 294 (d) (2) [2] of the Internal Revenue Code. *349 Petitioner does not deny that there was substantial underestimation of her estimated tax in both years. However, she says that she signed the necessary returns in blank and relied upon Ambuhl to prepare and file them. Thus, she opposes imposition to the additions to tax for those years on the grounds that such substantial underestimations were due to reasonable cause and not to willful neglect. The falsity inherent in petitioner's position is manifest. The short explanation is simply that the code section in question makes no general provision for the abatement of the addition to tax prescribed therein upon a showing that reasonable cause existed for the dereliction proscribed therein. But even if such were the fact, petitioner could come within such provision only by first showing that the person upon whom she relied was qualified to advise or to represent her in tax matters and that she actually relied upon such qualifications. Rene R. Bouche, 18 T.C. 144. Clearly, such requirement is not met by an attempt to show absolute reliance upon one who not only was uneducated and untrained in legal tax matters, but whose integrity and honesty was generally known to be questionable. *350 Petitioner's estimated tax was admittedly substantially underestimated for the years 1944 and 1945, and she is liable for additions to tax in those years as provided in the statute. Respondent is therefore affirmed. Decision will be entered for the respondent. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).↩
2. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial underestimate of estimated tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60 (a), * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * (or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year.↩