Nicholas J. Nigra, Jr. and Beverly Nigra v. Commissioner.
Nigra v. Comm'r
Docket No. 4038-65.
United States Tax Court
T.C. Memo 1968-273; 1968 Tax Ct. Memo LEXIS 25; 27 T.C.M. (CCH) 1456; T.C.M. (RIA) 68273; November 27, 1968. Filed Leonard B. Hankins, 4014 Long Beach, Long Beach, Calif., for the petitioners. Morley H. White and Allan D. Teplinsky, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in income tax and additions thereto for the petitioners as follows: Addition to
tax under
Year
Deficiency
Sec. 6653(b) [1]
1955
$1,208.27
$ 604.13
1956
3,938.25
1,969.13
1957 2,491.00
1,245.50 $7,637.52
$3,818.76
*26 The crucial issue is whether petitioners filed false and fraudulent income tax returns with intent to evade taxes for any of the years involved. In the absence of fraud, each of the years in question is barred by the statute of limitations. [2]
Findings of Fact Petitioners Nicholas and Beverly Nigra (hereinafter called Nicholas and Beverly) are husband *27 and wife who had their legal residence in Los Alamitos, California, at the time of filing the petition herein. They filed joint income tax returns for the years 1955, 1956, and 1957 with the district director of internal revenue, Los Angeles, California. The legal name of the petitioners is Nigra, although they also used the surname "Nash" during the years in controversy. Beverly also used the name "Beverly Jean Fight" (her maiden name) during this period. Nicholas entered the dance studio business in 1952, having previously worked about three years as an instructor for his father, who owned a dance studio franchised by the Arthur Murray organization. The father had on occasion used the name "Nash." Nicholas began his dance studio business in 1952 in Lakewood, California, using the name Starlite Dance Studio. At various times during the years in question, petitioners also operated studios in Norwalk, 1457 Garden Grove, and Anaheim, California. The Garden Grove studio was closed in April and the Anaheim studio was closed in May of 1957. Beverly worked with Nicholas from the opening of the studio in May 1952; they were married in November 1953; and they continued to operate *28 studios during all periods relevant to this case. During the years in question, petitioners maintained checking accounts in the name of Starlite Dance Studio at the Lakewood Village and Norwalk Square branches of the Bank of America and at the Norwalk Commercial & Savings Bank, a checking account in the name of Beverly Jean Fight at the Lakewood Plaza Branch of the Bank of America, savings account number XXXX, in the name of Nick Nash, Jr., at the Los Altos office of United States National Bank (formerly Long Beach National Bank), and savings account number XXXX, also in the name of Nick Nash, Jr., at the Bank of America, Lakewood Plaza Branch. The last account was changed to a checking account in October 1957. The petitioners sold contracts in varying amounts for dancing lessons, charging between $7 and $11 per hour. The students were given receipts for money paid to the studios. Most receipts were issued from a book of pre-numbered forms, while some came from a smaller receipt book, and at least one was written on a blank piece of paper. A substantial portion of the payments received were for lessons to be taken in the future, sometimes in subsequent years. Payments for certain *29 contracts involving prepaid dancing lessons were recorded in the smaller receipt book and were deposited in savings account number XXXX or in savings account number XXXX. Payments in settlement of certain contracts for future lessons were also deposited in these accounts. From time to time amounts were transferred from these accounts to the checking accounts in the name of Starlite Dance Studio. To encourage business, the studios sponsored numerous parties to which all students were invited and also gave parties for the "Century Club," which consisted of students who had contracted to receive 100 or more hours of dancing lessons. At these parties the studios would serve refreshments. Petitioners deducted, under the category of entertainment and promotion expense, $3,641.54 in 1955, $3,698.28 in 1956, and $2,798.09 in 1957. Respondent disallowed $3,277.39, $3,548.47, and $2,518.29 of these respective amounts. Petitioners reported gross receipts from the dance lesson business of $51,834.18 in 1955, $67,405.40 in 1956, and $38,795.82 in 1957. The respondent determined that petitioners received additional gross receipts in those years of $2,434.32, $12,242.89, and $8,924.73, respectively. *30 In their 1958 return, petitioners reported gross receipts of $42,943.00. Petitioners purchased a house in Westminster, California, for investment purposes on March 22, 1956. They rented the property from June 1956 to May 1958. The rental agreement provided for a security deposit of the last month's rent, payable in June 1956, and a rental payment of $100 a month, with the exception of June and July of 1956, in which adjustments were made because of expenditures incurred by the lessee on the petitioners' behalf. Petitioners received rent for this property of $749.86 in 1956 and $1,200 in 1957. These receipts were deposited into the Beverly Jean Fight account at the Bank of America, Lakewood Plaza Branch. Petitioners purchased a house in Long Beach, California, for investment purposes, on March 1, 1957. This property was rented from June through December 1957 for $110 a month, making a total of $770 rent received by petitioners in that year with respect to this property. These rent payments were also deposited into the Beverly Jean Fight account. The petitioners sold their Norwalk Dance Studio to Bobby Dean Reay (hereinafter called Reay) in January 1957 for $5,300. Reay made a *31 down payment of $2,000, signed a note for the remaining $3,300 with 5 percent interest, and agreed to pay $100 monthly on the balance. Reay also entered into an agreement which allowed him to use the name Starlite Dance Studio. The capital gain from the sale of the Norwalk studio was $3,524.10. None of the rent payments and none of the Reay payments, with the exception of those relating to his use of the Starlite name, were recorded in petitioners' books of account. Only $700 in rent for each of the years 1956 and 1957 and the payments from Reay for the Starlite name were reported in petitioners' tax returns for the years in question. Petitioners received interest income on savings accounts numbers XXXX and XXXX during the years in question of $21.92 in 1955, $80.66 in 1956, and $156.38 in 1957, which was not reported in their tax returns. 1458 In 1954, petitioners retained one Stanley Greer, a public accountant, to provide accounting services, including the creation and maintenance of the necessary books of account for their business and the preparation of monthly income statements and tax returns. Throughout the years in question, petitioners furnished or made available *32 to Greer's office the receipt stub books (but not the smaller receipt book), bank statements for the checking accounts in the name of Starlite Dance Studio, and other pertinent data. Greer's office set up and maintained books of account, consisting of a ledger and cash receipts journal. In this process bank statements covering the checking accounts were reconciled. The books of account were incomplete, inaccurate, and inadequate. Greer's office prepared petitioners' income tax returns for the years 1954 through 1957. One Jacob Zitzer worked as an accountant for Greer during the period in question. Sometime prior to the years in question, Greer advised petitioners to segregate prepayments for dance lessons to be given in the future and to make adjustments as lessons were given. As a result of that advice, petitioners recorded certain receipts on the smaller receipt book, made certain deposits, as previously found, in the savings accounts numbers XXXX and XXXX, and from time to time transferred sums therefor to the checking accounts in the name of Starlite Dance Studio. Greer also knew of the acquisition of the rental property in 1956 and of the transaction involving the sale of *33 the studio to Reay. Petitioners were indicted on December 5, 1962 for income tax evasion. The indictment included two counts, one for the taxable year 1956 and one for the taxable year 1957. The trial took place between May 16 and June 8, 1963 and no verdict was returned. On September 9, 1963, petitioners pleaded nolo contendere to the count relating to 1957 and a $1,000 fine was imposed on each. The count relating to 1956 was dismissed. Opinion The taxable years involved herein are 1955 through 1957. We are satisfied that there was some underpayment of tax on the part of petitioners in each of the taxable years before us. However, since there is no evidence of consents extending the period of limitations to the date of the mailing of the deficiency notice and since the deficiency notice herein was issued more than six years after the filing of the returns, assessment is barred unless we can find that any underpayment was "due to fraud." See section 6501. The existence of fraud is a question of fact. To support a determination of fraud for any year, we must find that, as to that year, petitioners knowingly understated a portion of their taxable income with the intent to evade *34 tax. E.g., Gromacki v. Commissioner, 361 F. 2d 727 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court. Under section 7454(a), the burden of proof is upon the respondent and he must satisfy his burden by clear and convincing evidence. See, e.g., Jacob D. Farber, [Dec. 27,201] 43 T.C. 407, 419 (1965), reaffirmed in a supplemental opinion, 44 T.C. 408 (1965), and Luerana Pigman, 31 T.C. 356, 370 (1958). Fraud will not be imputed or presumed and mere suspicion is insufficient. See, e.g., Carter v. Campbell, 264 F. 2d 930, 935 (C.A. 5, 1959). At the same time, it is axiomatic that direct proof of fraud is seldom possible and that a finding of fraud can be based on the taxpayer's conduct in relation to the underlying transactions. See Leon Papineau 28 T.C. 54, 57-58 (1957). Moreover, section 6653(b), by its very terms, and the decided cases establish that if part of the deficiency for any year is due to fraud, the addition to taxes attaches to the entire amount found to be due for that year. Arlette Coat Co. 14 T.C. 751 (1950). It is within the foregoing legal frame of reference that the *35 factual question involved herein must be determined. Before proceeding to an analysis of the evidence, we are constrained to note that our search for the true picture herein has been made difficult by a variety of factors. The transactions involved took place from 10 to 12 years prior to trial, with the result that certain evidence was unavailable. [3] Such 1459 evidence as existed was incomplete and confusing - due in part at least to the unwillingness of counsel to stipulate many documents whose existence was undisputed. Memories of witnesses were dimmed, perhaps conveniently so at times. Much of the critical testimony was self-serving. This was particularly true of petitioners' own testimony. In addition, petitioners' accountant, Greer (who was called by respondent), seemed more interested in avoiding possible criticism of the manner in which he discharged such responsibilities as he had than in attempting to develop the facts pertinent to the issues involved herein. The trial was further complicated by constant jousting on the part of counsel for the parties, often over extraneous legal technicalities, which caused them to divert their attention away from the mainstream of *36 the case. This was particularly true of petitioners' counsel, whose attempts to further his clients' interests were on several occasions so overzealous as to cause him to overlook his responsibilities to this Court. In short, we think that both the preparation for trial and the trial itself left a great deal to be desired. We have made these comments in the hope that they may have a constructive influence on subsequent trials in this Court, recognizing all too clearly that the elements which we have mentioned cannot distort our focus or in any way lessen our responsibilities to both parties to determine the facts solely on the basis of the evidence before us and to apply the applicable law thereto. We now turn to the *37 evidence before us. Initially, there is one element of general applicability to the specific items to which respondent contends the badge of fraud attaches. That element relates to the role of the accountant, Greer, and his associate Zitzer. Unquestionably, Greer's office kept the books of account of petitioners' business activities and prepared the tax returns for the years involved herein. There was considerable testimony as to whether that office, in the process of preparing the books and accounts, worked only from the receipt stubs for dance lessons or whether it also reconciled bank statements. We are satisfied, and we have so found, that Greer's office was employed to provide petitioners with broad accounting services (including the preparation of tax returns), was furnished not only with receipt stubs but also, at the very least, with bank statements covering the commercial accounts in the name of Starlite Dance Studio, and, in fact, made such reconciliations. We will deal later with questions relating to other information connected with petitioners' finances which Greer knew or should have known and to certain advice which Greer allegedly gave petitioners. In the meantime, *38 in the absence of any evidence questioning the competency of Greer or his associates to provide the services they were expected to render, we conclude that petitioners were entitled to rely upon Greer's office to provide such services and that the fact that his office performed inadequately or incompetently cannot be equated with fraud on petitioners' part. Compare John Marinzulich, 31 T.C. 487 (1958), acq. 1959-1 C.B. 4, and Dale R. Fulton, 14 T.C. 1453 (1950), with Frances Ambuhl, a Memorandum Opinion of this Court dated Mar. 17, 1953) 12 T.C.M. 284). Respondent relies upon four principal areas as constituting proof of fraud herein. We will deal with each area separately. Alleged Omitted Items of Dance Studio Income There is no question that petitioners received payments in advance for dance lessons and that often these lessons were not taken until a subsequent year. Nicholas had been exposed to the financial problem of paying tax on such prepaid amounts when he worked for his father, who ran a dance studio. Both petitioners testified that when they retained Greer to perform the accounting services for their business, he *39 advised them to separate these advance payments and that, pursuant to his advice, they maintained the smaller receipt book and deposited such payments in separate bank accounts. Beverly further testified that from time to time she would analyze these separate bank accounts and determine how much of the balances therein represented lessons to be given in future years and that she would then transfer what she determined to be in excess of the appropriate reserve for such future lessons into the regular commercial accounts of the business. [4] Respondent contends that petitioners' explanation is a fabrication and is substantially contradicted by other evidence in the record. 1460 There are diverse strands in the fabric of this situation. Certain payments for dancing lessons were deposited into savings accounts in the individual name of Nicholas which were not normally used in connection with the conduct of their business. These payments were not recorded in the account books of *40 petitioners' business. Concededly, there is no clear pattern of handling claimed prepayments or of transfers from the savings accounts into the commercial bank accounts of the business. But this is not conclusive, since it appears that the reserve function which these savings accounts were claimed to serve was not carried out in terms of an analysis of each specific contract under which advance payments were made. Rather, it appears that the claimed reserve plan was operated in terms of a bulk analysis from time to time of the aggregate amount representing prepaid lessons. This also may explain why some payments representing settlement of certain outstanding contracts found their way into the savings accounts. The fact is that transfers were made from the savings accounts to the commercial accounts during the years in question, a procedure inconsistent with any objective of secreting funds. Such an explanation becomes even more plausible when one takes into account the fact that Greer's office supposedly reconciled the commercial bank statements with the books containing receipt stubs which were furnished to it and consequently was on notice as to these deposits. At the trial, neither *41 Greer nor his associate Zitzer was asked whether these discrepancies were investigated. While petitioners' testimony that Greer advised them to segregate prepayments was obviously self-serving, there are certain countervailing factors which should not be disregarded. Respondent called Greer as his witness but never saw fit to question him about such purported advice, [5] contenting himself merely with putting the general question as to whether petitioners were on a cash or accrual basis, to which Greer simply replied, "To the best of my knowledge, a cash basis." It is common knowledge that many taxpayers use hybrid methods of accounting; such use, although often incorrect for tax purposes, is certainly not per se fraudulent. Nor can we overlook the fact that the tax treatment of prepaid income for services to be rendered in the future was an open question during the period before us and was not settled in favor of the Government until a later date, although concededly the controversy involved primarily accrual basis taxpayers. Cf. American Automobile Assn. v. United States, 367 U.S. 687 (1961), affirming 181 F. Supp. 255 (Ct. Cl. 1960); Bressner Radio, Inc. v. Commissioner, 267 F. 2d 520 *42 (C.A. 2, 1959), reversing 28 T.C. 378 (1957); Commissioner v. Schlude, 367 U.S. 911 (1961), remanding 283 F. 2d 234 (C.A. 8, 1960), reversing 32 T.C. 1271 (1959). Moreover, there are indications that Greer's office knew of these savings accounts. To be sure, Greer stated generally that he was only aware of commercial accounts, but he did not identify which accounts he had in mind, nor did respondent question him specifically with respect to the savings accounts. Similarly, no inquiry was directed to Zitzer in this regard. [6]
Finally, we note that petitioners' assertion that they discontinued *43 the practice in 1958 and picked up the segregated prepaid income in that year finds some support in the comparison of the proportionately larger amount of gross receipts reported in their 1958 return, at a time when they had at most two studios, with gross receipts in previous years when they had four studios. [7] In the context of this case, we are not impressed with respondent's cavalier dismissal of this corroborative factor, slim as it may be, through the broad assertion that the 1958 return occurred after the start of the investigation of petitioners' tax returns for the years in question. In view of the foregoing and on the basis of the entire record, we cannot say that respondent has presented sufficient evidence of fraud, with respect to prepayments for dance lessons, so as to enable us to hold that he has carried his burden of proof. 1461 Alleged Omitted Items of Rental Income Petitioners owned one house for investment purposes in 1956 and two in 1957. They reported $700 as rental income in each year. The tax returns indicate that the amount reported was derived exclusively from the property acquired *44 in 1956. Petitioners in fact received rental income of $749.86 in 1956 and $1,970 in 1957. This income was deposited in the Beverly Jean Fight account (petitioner Beverly's maiden name). Beverly testified that she reported the property owned in 1956 and the rental derived therefrom to Greer and that Greer made notes of this conversation. The property was rented for only seven months in that year. The record is silent as to whether Greer was specifically told about the property acquired in 1957. As in the case of the savings accounts covering prepayments for lessons (see pp. 16-17, supra), we were not given the benefit of any testimony of Greer or Zitzer with respect to their knowledge, or lack of knowledge, of the Beverly Jean Fight account. On the record before us, we can, with equal facility, find that the failure to report the correct rental income was the fault of Greer's office as that it was the result of concealment of such information on the part of petitioners. [8] Consequently, we hold that respondent has failed to meet his burden of proof as to this area of alleged fraud. John Marinzulich, supra.
*45 Alleged Omissions of Proceeds of Sale of Norwalk Dance Studio In 1957, petitioners sold the Norwalk dance studio to one Bobby Dean Reay, but the proceeds were not reported on the 1957 return. We are satisfied that Greer's office, which also did the accounting work for Reay, knew of the sale and of the terms thereof. In this connection, we note that franchise payments received from Reay in connection with the sale transaction were reported. Under these circumstances, the failure to include the proceeds of the sale itself in 1957 income may well have been attributable to Greer's office and cannot be held to be a badge of fraud on petitioners' part. Alleged Omission of Interest Income Petitioners omitted from income $21.92, $80.66, and $156.38 of interest on savings accounts in 1955, 1956, and 1957, respectively. We have previously noted the possibility that Greer's office knew of these accounts (see p. 17, supra). Moreover, evidence of omission of income, standing alone, does not establish fraud. See Merritt v. Commissioner, 301 F. 2d 484, 487 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court. Under all the circumstances herein and in light of the *46 small amounts involved, we cannot find a badge of fraud in this area. Alleged Excessive Deductions Respondent claims that petitioners took fraudulent deductions for entertainment and promotion expenses. Petitioners deducted, under this category, $3,641.54 in 1955, $3,698.28 in 1956, and $2,798.09 in 1957. Respondent disallowed $3,277.39, $3,548.47, and $2,518.29 of these respective amounts. There was considerable testimony as to parties given by petitioners for students and prospective students. While such testimony was extremely general and of little value in determining precisely the amounts spent, we are satisfied that petitioners expended substantially more than respondent allowed. But our problem is not to determine the extent of the allowable deductions. The question before us is whether petitioners were fraudulent in this area. We hold that respondent has not sustained his burden of proof in this respect. Miscellaneous Respondent seeks to dramatize the fact that petitioners used the name of "Nash" and Beverly's maiden name, Fight, on the individual accounts and asserts that this constituted concealment which should be equated with fraud. While the reason given for *47 the use of Beverly's maiden name, namely to encourage her parents to save, rings hollow, the same cannot be said of the use of the name "Nash." The slurring possibilities inherent in petitioner Nicholas' real name and the fact that both he and his father used "Nash" on various occasions for business and social purposes seems to us to have the ring of truth. In any event, we are not convinced that the use of these other names is a badge of fraud under all the circumstances herein. Respondent also suggests that petitioners' withdrawal of their records from Greer in 1958 was such a roadblock to respondent's examination of their tax liabilities as to 1462 constitute fraud. We do not think that this factor, standing alone, can be equated with failure to cooperate (and there is no further evidence of any such failure in the record before us) sufficient to constitute fraud, even if we were inclined to view any such failure as determinative of fraud. Cf. Granat's Estate, 298 F. 2d 397 (C.A. 2, 1962), affirming per curiam a Memorandum Opinion of this Court. Finally, respondent points to the criminal prosecution of petitioners for income tax evasion. The two counts in the *48 indictment covered the taxable years 1956 and 1957. After a long trial (at which both petitioners testified) and lengthy deliberation by the jury, no verdict was returned. Because of the complexities of another trial and the expense involved, petitioners pleaded nolo contendere to the count relating to 1957 and a $1,000 fine was imposed on each. The count relating to 1956 was dismissed. Although a plea of nolo contendere may be considered some evidence of fraud, we are not inclined, under the foregoing circumstances, to give much weight herein to such plea. Compare Mickler v. Fahs, 243 F. 2d 515 (C.A. 5, 1957), with Masters v. Commissioner, 243 F. 2d 335 (C.A. 3, 1957), affirming 25 T.C. 1093 (1956), and Kilpatrick v. Commissioner, 227 F. 2d 240 (C.A. 5, 1955), affirming 22 T.C. 446 (1954). As we stated at the outset, we are satisfied that petitioners underpaid their tax in each of the years in question and, if we were called upon to do so, we could hold that they had failed to sustain their burden of proof with respect to a substantial portion of each of the basic deficiencies asserted by respondent. But our problem *49 is not the measure of those deficiencies, but whether there was fraud and, as we have pointed out, the burden of proof on this issue is upon respondent, not petitioners. We are not unaware that recurrent omission of substantial amounts of income is, in and of itself, strong evidence of fraud. Browne v. Commissioner, 367 F. 2d 386 (C.A. 4, 1966), affirming a Memorandum Opinion of this Court; Leon Papineau, supra, Estate of Joseph Nitto, 13 T.C. 858 (1949). But, under the circumstances of this case, where there is evidence of reliance on an accountant properly to perform his duties, the claimed omissions (which, on the whole, were not overly large in relation to gross income, or gross receipts insofar as the claimed omitted receipts were concerned) do not seem to us to require the application of this doctrine. Nor can we find that confraternity of errors which sometimes constitutes the sinister badge of fraud. See Webb v. Commissioner, 394 F. 2d 366 (C.A. 5, 1968). We do have our suspicions, indeed strong suspicions, that fraud may have been present, but respondent has not flushed out the necessary evidence to cause us so to find. *50 Cf. John Marinzulich, supra; L. Glenn Switzer, 20 T.C. 759 (1953). Nor is evidence of "negligence, careless indifference or disregard of rules and regulations," with which this case abounds, enough to carry the day for respondent. Cleveland Thurston, 28 T.C. 350 (1957); E.S. Iley, 19 T.C. 631 (1952); Walter M. Ferguson, Jr., 14 T.C. 846 (1950). In short, the respondent has failed to carry his burden of proof. Such being the case, we are unable to find fraud, and the deficiencies asserted by the respondent are therefore barred under section 6501. Decision will be entered for the petitioners. Footnotes
1. All statutory references, unless otherwise specified, are to the Internal Revenue Code of 1954. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).↩
2. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
3. No satisfactory explanation was furnished as to why material submitted in the prior criminal proceeding, and which might have greatly assisted respondent in sustaining his burden of proof herein, was not produced. The indictment was returned on December 5, 1962, the criminal trial took place between May 16 and June 8, 1963, and the plea of nolo contendere was submitted on September 9, 1963, but the deficiency notice herein was not mailed until April 13, 1965.↩
4. As we read the testimony, Beverly did not make an anaylsis of the prepaid amounts attributable to each particular student but simply made a bulk determination of such amounts as of any given date.↩
5. Although Greer testified prior to petitioners with respect to this issue, respondent was on notice as to this claim from the opening statement of petitioners' counsel. Moreover, Greer could easily have been recalled after petitioners so testified.↩
6. Originally, Zitzer was also to have been called by respondent, but in the end respondent decided against this procedure. He was then called as petitioners' witness and testified at considerable length. Respondent, however, chose to subject him to a very brief and cursory cross-examination.↩
7. During part of 1957, petitioners had only two studios.↩
8. Thus, with respect to the property owned in both 1956 and 1957, it is entirely likely that Greer's office simply used the same figure for both years without recalling that the property had been rented for only seven months in the earlier year.↩